All right. Thank you, everyone. We are now back from our break. We're going to call the next case, Gibson v. Cendyn Group, LLC, case number 243576. Here, each side will have 15 minutes. It's my understanding that Mr. Gibson will be taking 10 of those minutes while the United States is appearing as amicus counsel and would like five, or did I get that wrong? No, you got it correct, Your Honor. Perfect. Okay. Of course, if you'd like to reserve time for rebuttal, please be aware you're responsible of keeping track of your own time and also let me know if you do intend to keep any time. May it please the Court, Steve Berman, I reserve two minutes for reply. Okay. And my goal today is to be as excellent as that law student was. It's truly, truly fun to watch that. On the serious side, may it please the Court again, I start with the epic decision because in the epic decision, the Court said when you're analyzing a Section 1 claim, there's two components. The first is a threshold component. Is there a contract or conspiracy? And the second, is that contract or conspiracy unreasonable? So with that framework, with that two-step inquiry in mind, we submit the District Court committed two errors that warrant reversal. First, the Court failed to follow this Circuit's precedent and Supreme Court precedent that says if you have a contract, that meets the first threshold question. No, but the contract can't be any contract. It has to be a contract which restrains trade, right? No, Your Honor, I submit that under Supreme Court precedent and this Court's precedent in epic and paladin that any contract Including your client's contract with you is a possible Section 1 if it's unreasonable? It meets the threshold question that it's a contract. But it's not a conspiracy or a combination. It's a contract. Every commercial relationship is a contract, is it not? That's why we have the second part of the test, and that's the second error the Court made. So once you meet the threshold question, is there a contract, then you look and see whether that contract is unreasonable. No, it's whether the restraint is unreasonable, but the contract has to first restrain trade in order to be subjected to the inquiry whether it's unreasonable, doesn't it? It does, and I submit to Your Honor that every single Supreme Court case that has considered this and every Ninth Circuit case says that every commercial agreement I'm quoting now from this Court's decision in paladin that the Supreme Court cases demonstrate that every commercial agreement is a restraint of trade. Meaning that every commercial agreement, and I'm quoting, is an agreement on two or more entities. The reason for this is simple. Every agreement, every regulation of trade restrains. To bind, to restrain is of the essence. Therefore, we've met threshold test here. There was a contract, and then what the Court should have done is to have gone to step two and to see whether there was an unreasonable interference with competition pled plausibly in this complaint. And I submit to the Court that on the second question, whether there was an unreasonable restraint, there was error there as well because this Court has said that when you want to look whether there are plausible allegations of effects, detrimental effects on competition, one of the things you do is look at whether price has been affected, whether price has been affected. And if the Court had gone to the second step, the Court would have sustained the complaint because we went out and we hired experts. And we asked those experts to look at prices of these hotel rooms compared to markets where there may not have been a restraint. And on that point, I think our best point is to look at the graphs at pages 20 to 21 of our reply brief. And there we've taken the prices of casino hotels and non-casino hotels over a period. And you see in that chart that in 2015, when Rainmaker began using competitor pricing in its formulas, there's a huge leap between the price of hotel rooms in Las Vegas and the price for goods and services for hotel rooms. And you do not see that leap when you look at non-casino hotels. And we also, as a second step, we compared the price of rooms at the Venetian, which is not a user of Rainmaker, right? So it's an untainted user. And we found a statistically significant increase in prices. So we met the plausibility test, and the Court erred in first failing to find that there was a restraint, and then second in failing to find that we plausibly alleged an improper interference with competition. That's my pitch, unless you have some questions. I know I have a lot more time. Use it. Then let me talk a little bit about your Court's decision, which I think is also important in this kind of case, and that is in the musical instruments case. I have some acquaintance with that. I think you do, Your Honor. In the musical instruments case, the Court was careful to say that there can be a series of vertical agreements, even without a horizontal conspiracy, and the impact of those vertical agreements can be anti-competitive. And that's exactly the situation we have here. That was a hypothetical, because it wasn't involved in that case, right? It wasn't in the facts of that case, but you went and were very careful in talking about the rimless conspiracy, a rim conspiracy, a vertical set of agreements that could injure competition. But whether it's a set of agreements or not is really an assertion by the plaintiff. There's no factual allegation that there was any collusion to make it a set of vertical agreements, correct? Well, there is no evidence. Well, there's no allegation of any collusion between the hotels in using Send-In, correct? You've abandoned your first claim. Well, there is allegations that every hotel knew which other hotels were subscribing. So that's conscious parallelism, all right? What are the plus factors? Well, the plus factors here would be a high barrier to entry, right? And acting against self-interest, because prior to this time, hotels filled rooms. That was the revenue market, not cutting back on rooms in order to collectively jack up prices. Is revenue more important than the bottom line? Well, revenue was doing well, apparently, before that time. Revenue? We're talking about profit, not revenue. Yes, okay. But if I was competing for more profits by filling my rooms, and now I know I don't have to compete, I can collectively subscribe to this algorithm service, and I raise it off. But collectively, that implies that there's some agreement between the people who are using Send-In, correct? I'm not. As you said, Your Honor, we're not pushing that horizontal claim. We're pushing a vertical claim. And I think under the Ligon case ---- But this isn't a typical vertical agreement, is it, Mr. Berman? I mean, a typical vertical agreement is a price maintenance agreement. And that's when the manufacturer requires a price to be charged, and that is a restraint of trade as to the retailer because he can't charge any other price. Here, that's not there. I agree it's not there. So why do you call it a vertical agreement? It's not really a vertical agreement. It's an agreement to use an agency to recommend prices, correct? That's correct. So it's a hybrid agreement. And what the court in American Needle said is you don't look at the form, you look at the effect. And what we're alleging here under American Needle is that the effect of all these vertical agreements being produced from this common rainmaker was to increase prices. Can an entrepreneur increase his prices? By himself. By himself. Yes. Where is the allegation that the increase in prices was not done by each hotel by itself? It was done by each hotel through a central person, not just by itself. If they had a real estate magnate who wanted to tell them what the best price was, wouldn't that be all right? Say that one again. If they had a magical real estate person who knew the best prices and they all hired him to make a recommendation, what would be wrong with that? I think it would be wrong. If the effect of each of those vertical agreements was to raise price in a market, that's the exact anti-cut-and-beat behavior that is frowned on by the Ligon case. Counsel, does it matter that Sendin does not require the hotels to accept its price recommendations? Does that matter? I don't think it matters if the effect is price increases. In other words, what we know from the allegations of the complaint, that 90% of the time they do accept these prices. But for the purposes of the vertical agreement, I don't think it's the percent that's important. I think it's that we've plausibly shown that these hotels and no other hotels, since they started doing Rainmaker, have collectively raised prices. I see my time is up now. Thank you. Rest for my two minutes. Thank you. Okay. Thank you. Good morning, Your Honors. May it please the Court. Spencer Smith for the United States. We're here today because the district court applied an incorrect legal standard in dismissing plaintiff's Section 1 claim, challenging a set of vertical agreements. And if affirmed, that legal error would have ripple effects for antitrust enforcement beyond this case. If I may, I'd like to first explain our view of how the district court erred, and then I would like to try to address Judge Bea's questions regarding contracts in restraint of trade and considering a set of vertical agreements subject to the Court's questions, of course. Section 1 declares illegal every contract combination or conspiracy in restraint of trade. The Supreme Court has interpreted that language to comprise two primary elements. First, concerted action. Second, that unreasonably restrains trade. Defendants haven't disputed that the concerted action element of plaintiff's vertical claim is met here by the contractual agreements between Sendin and the casino hotels. Oh, I think they haven't. They said those are individual agreements. I don't think they're vertical agreements, but they're individual agreements. And the plaintiffs have abandoned their concerted action claim. I don't think that's quite right, Your Honor, on multiple fronts. The first, I'm not sure I understand appellees to dispute that the concerted action element of the vertical claim is met by the existence of contractual agreements between Sendin and the casino hotels. And, yes, plaintiffs here have abandoned their horizontal claim, but it's not appropriate to require agreement or collusion among all the casino hotels for purposes of their vertical claim. Do you have a case that says that? Well, yes, all sorts of cases, Your Honor. For instance, in Legion, you wouldn't have expected all of the parties to the resale price maintenance agreements to have agreed with each other. So, too, in exclusive dealing cases, which are paradigmatic Section 1 cases involving vertical agreements, very often the parties to such agreements would not have agreed with each other to enter into such exclusive dealing arrangements, and we don't require them to under Section 1. The issue in this case, as we see it, is whether that concerted action unreasonably restrains trade, which means, as we explain on page 16 of our brief, unreasonably restricts competitive conditions. That's what the Supreme Court held in National Society of Professional Engineers, quoting Standard Oil. And as the Court made clear in its recent Alston decision, in a rule of reason case, a plaintiff can carry its initial burden on the unreasonable restraint of trade element by showing a substantial anti-competitive effect. So under the correct legal framework, the district court should have analyzed the complaint to determine whether it adequately alleges anti-competitive effect. But the district court never did that. Instead, it came up with a new rule. It held that because sentence prices weren't binding, this goes to your question, Judge de Alba, because they weren't binding, the court thought, it, quote, cannot be that the challenged agreements restrain trade. That's on page 18 of the excerpts of record. Okay, that rigid and sweeping rule is inconsistent with settled antitrust principles, and it would upend multiple areas of antitrust law. And if there's time, I'd like to come back to some of those consequences. But the key point is, if the agreements have any competitive effect, they unreasonably restrain trade, that's what in-restraint of trade means under the statute. And this is important because there can be anti-competitive effects from a group of competitors all signing up with a common entity to use the same pricing algorithm, even if the algorithm's prices aren't binding, Judge de Alba. So a categorical rule like the one adopted by the district court here, that there can be no restraint of trade, as long as the competitors retain some discretion to deviate from the algorithm's prices, would, in our view, effectively immunize this type of arrangement from antitrust scrutiny, and that can't be right. On consequences, just very briefly, we think this case is important enough for what it means for antitrust analysis of pricing algorithms, but the effect of the district court's rule would go beyond cases involving such algorithms. List price cases like Plymouth dealers and high-fructose corn syrup, we don't think can be squared with the district court's reasoning. And in addition, and I think this is important, Section 1 has long applied to the sharing of competitively sensitive information, and information-sharing cases don't typically involve restraint in the very narrow sense urged by appellees here, let alone binding prices. We cite on page 29 of our brief, Todd v. Exxon, which I think well explains how the rule of reason can apply to information-sharing itself. And this court has recognized the viability of such claims in the petroleum products case. There's no direct sharing between the hotels, correct? Two points, Your Honor. First, appellees make much of the fact that one hotel's competitively sensitive information does not, another hotel doesn't get it back out of the algorithm. But quite frankly, when you have a central entity that is collecting the information, it sort of obviates the need for that direct information-sharing. But the broader point on the information-sharing cases more generally is just that they don't entail or require this restraint on decision-making that appellees have urged here. And so if Your Honors were to consult the Todd v. Exxon case, for instance, it cites a litany of Supreme Court cases, antitrust cases involving information that just can't be squared with their argument. Seminal cases like Container Corp. or Gypsum. In Gypsum, for instance, the Supreme Court made quite clear that mere, quote, communication can violate the rule of reason when pursuant to an agreement and having anti-competitive effect. We ask the Court to correct the error in the decision below, and we thank you for the opportunity to present our views today. Thank you. Good morning, Your Honors. May it please the Court. Melissa Arbacheri representing Sendine on behalf of the defendant's appellees. If I could start with three quick points or clarifications. What this case is not about. This case is not one where there's a commingling or pooling of confidential competitor information. This case is not about delegating pricing authority to a third party. The district court said both of those things. Plaintiffs do not challenge that here today, and it does make this case different than a number of the pricing algorithm cases that are pending in the lower courts. Secondly, the appeal now is a shell. You said three things. Three things. Okay, so that's the first one, even though I might have packed a little bit into there. The second point is that this appeal is now a shell of its former self. They have expressly abandoned the hub-and-spoke claim. That was the primary claim that was pressed below, and that has consequences. So any discussions about concerted action among the hotel defendants, whether it's collusion, agreement, or otherwise, is completely off the table at this point as if the hotel defendants had no relationship to one another. This is all about their count-to, which is about the vertical claim or whatever we're going to call the agreement with Sendine itself. Third point is what they're really asking this court to do is unprecedented. You heard my friend on the other side come up and say, all you need to do to get past the motion to dismiss stage is say there was a contract, any contract will do, and look, there's higher prices. No court has ever held that, and both parts of that equation are flawed, but especially the absence of a link between the two, between the contract that they want to point to and the purported higher prices makes the equation worse still, and I want to take those in two parts. The first point is what the district court actually held, that there is no restraint of trade. It is critically important that what they have to identify is not just any contract. It's not just any agreement. It's an agreement that is the source of the anti-competitive harm that they're alleging. The two need to be connected, and with all due respect to the Department of Justice, we absolutely are disputing the concerted action requirement, not because there's no agreement. There's a non-exclusive license agreement, but because there's no restraint of trade, and we cite a number of cases, malarkey out of this court, Buffalo Broadcasting out of the Second Circuit, and St. Luke's out of the Sixth Circuit that make this point, but I think the source that makes it the clearest is the Aretha Treatise, and that's 1437A and B, and that treatise we cited at page 58 and 59 of our answering brief, and what it says is contracts are ubiquitous. Every vertical arrangement for the most part has some sort of contracted issue. You have to define it at a more fine level of specificity, because otherwise the agreement requirement is completely meaningless. It has no work to do at all, but it actually does have work it needs to do. We're talking about a Section 1 claim, and it is important to distinguish concerted action from unilateral action, and so if what they're pointing to as the source of the anti-competitive harm is only unilateral action, it falls outside of Section 1. Secondly, they need to link up the two. There's a causation-like requirement. The anti-competitive harms have to be caused by the restraint they're alleging, so I think that really gets to the heart of the issue and what the district court was struggling with below. What is the restraint they're alleging actually caused the anti-competitive harm? Well, one place to look is the complaint itself. In the First Amendment complaint at paragraphs 3, I'm going to get this a little wrong, paragraphs, I had it in my head, but I don't get the paragraphs in a second, 365 and 367. They say it's an agreement to set prices and to delegate pricing. Well, the district court said the factual allegations do not support the existence of either agreement, and to be very clear, it's not because you're not required to accept a binding price. It's not because it's not the final price, all of the starting point cases that the DOJ points to. That's not the issue here. The issue is it is a non-exclusive license to have the permission, rather, to use a certain software. There is no agreement to use the pricing algorithm, the pricing recommendations in any way, shape, or form, to use them at all. They are purely advisory only. And so the allegations in the complaint do not identify the restraint, which is why my friend here is now saying forget all of that. It's just the fact that there's a non-exclusive license agreement. But they never link that up to the anti-competitive harms they're alleging. And my friend pointed to the graphs on page, I think it was 21, of the reply brief. Well, if you look at those graphs, they claim the anti-competitive effects started when? In 2015. What relationship does 2015 have to the license agreements? None at all. You see in our chart of the timeline, the first hotel defendant, 2004, was when the agreement was. Even the latest one was 2014. Why are they pointing to 2015? They say it in their opposition to the motion to dismiss below. It's at page 525 of the excerpts of record. They say 2015. That's the challenge restraint. And what do they define as the challenge restraint? They specifically say, namely, the complete integration of competitor pricing into guest rev in 2015. That's not an agreement at all. That's not a restraint at all. There's no connection between their anti-competitive effects theory and the restraint that they're alleging. Now, they point to cases from the Supreme Court and from this court that have broad language saying every contract is a restraint in some sense. Okay, fine. But what those cases are saying are that you have to read Section 1 more narrowly than that. It can't possibly just be every agreement. Your Honor's example, I think, of all the contracts we have in our everyday life are a good example of that. But instead, you have to define it more narrowly. Epic Systems, I think, is a great example. It has that language in there, but what was being pointed to? It wasn't just the developer license. It was three restrictions that were in the developer license. American Express before the Supreme Court, it was the anti-steering provision that was in the merchant agreement. Every case that's actually looked at this issue, instead of just quoted that broad language, has focused on a particular restraint. And so we think the court was absolutely right to say that the problem here is there's no alleged restraint of trade, and the court could resolve it on that grounds. Alternatively, you could look at it and say it's not unreasonable, or they haven't proved causation. The Fortress case out of this court reached a similar result as one of the reasons why the motion to dismiss was correctly granted. I think you could also look at it through the lens of the recent case involving Zillow that we cited in the 20AJ letter. Your friends have said the restraint wasn't considered by the court. The restraint was. It was. So what the court said is you have alleged that the restraint is setting prices or delegating pricing, as I just spent the first half of my opinion saying there aren't factual allegations to support that particular restraint. And I think their point is that that was wrong. All the court should have said is there's a non-exclusive license agreement. That counts as the restraint because it's an agreement, and jump right into the numbers and into anti-competitive effects. And I think that's what the case law doesn't support. I think the Zillow case is helpful for a number of reasons, but one of which is the unilateral point I made. There was a disagreement as to where the harm was coming from. Was it the optional rule, or was it how it was implemented, the website design? And the issue was if it was the website design, that was purely unilateral conduct. If I could spend a moment on musical instruments and footnote three in particular of that decision. What I just said about restraint of trade and what the district court held is more than enough to resolve this appeal. If the court does get into the issue of aggregation, I think that's just a second example of how far this goes from the normal antitrust case. Footnote three cited two decisions. It cited Dixon out of the Fourth Circuit, and it cited the Legion case. In Dixon, I think it's a perfect example where the court said, we are not going to act as if these two independent conspiracies are really one conspiracy. We're going to look at each allegation, the two different agreements, standing alone. And I think it said independently at least six times in that decision. So certainly that case is not an example of aggregation. The cases they point to where courts have done any version of aggregating either do involve a horizontal collusion allegation of some sort, which again has now been abandoned, or they're the exclusive dealing tying cases, which are just different in kind because there there's a discrete anti-competitive effect each time, and the courts are looking at them collectively to decide whether there's substantial foreclosure of the market. Increased prices. The court has said over and over and over again that that is not enough to allege anti-competitive harm. High prices exist for a number of pro-competitive reasons. You can't just say the prices went up and then move on from that part of the analysis. And I don't know if it's worth going into the stats. We have the arguments in our brief, but the reality is the charts do not show direct evidence of anti-competitive harm. What they pointed to as far as those charts go, look, don't just focus on the alleged conspiracy and those who actually subscribed to Rainmaker during the relevant period of time. They're either overbroad or too narrow in very different respects. The Venetian Comparer I think is a good example. They include MGM in there. The district court dismissed MGM as a defendant, finding that there weren't allegations that MGM used the software during the relevant period of time. One other fact that I think sometimes gets lost when we talk about subscribing to the revenue management software here, and the district court recognized this as well, the software has many other features besides the pricing algorithm. It has at least 10 other features, including detailed demand forecasting. And maybe this gets me to the 90% number. The 90% number in the complaint has nothing to do with the held defendants. It's a national number. According to the complaint, there's 5,500 hotels in 110 different countries that subscribe to the revenue management software. When it comes to the actual defendants, the allegations are absent. The only defendant that it talks about in terms of whether they use the pricing recommendations at all is Hard Rock. That's paragraph 175, and it just says they use it in some circumstances. They don't have any allegations about the other hotel defendants, and I don't think they could consistent with Rule 11. As we point out in footnote 4 of our brief, the hotel defendants filed initial disclosures saying that as a practice, they don't use the pricing recommendations. I guess one final point, and maybe this is a good place to stop if there are no further questions. There's a lot of reliance. I don't think it came up today, but in the briefs on the Plymouth case, and I know the Department of Justice cares a lot about the notion of starting price cases, I think Plymouth is actually quite useful for the point that we're trying to make. Because again, the issue here is not just they didn't agree to the final price. They didn't agree to do anything whatsoever when it comes to the pricing recommendations. And there is a world of difference between an advisory recommendation and what was going on in Plymouth and other cases. Because an advisory recommendation is just that. We all ask for recommendations in every aspect of our life. We ask for advice from people. Companies do the exact same thing. Outside consultants provide advice. Employees within the company provide advice. It doesn't bind anybody. And that's where we end up with the fundamental divide between concerted activity and unilateral action. And Plymouth, I think, said it exactly right. The focus needs to be on whether there is restrained ability to sell or hear price in accordance with their own judgment. Nothing that they have alleged restrained the hotel defendant's ability to price in accordance with their own judgment. And the Plymouth case, I should also add, affirmed a conviction while saying we're not affirming it just because there was a price list. We're instead affirming it for a bunch of other facts that are in the record that are not present here. And so maybe to sum it all up, I think the difficulty with the arguments on the other side, including the arguments of the Department of Justice, is number one, they're divorced from the factual allegations in this case. Number two, they blur concerted action and unilateral action in a really problematic way when it comes to Section 1. And number three, it leaves the motion to dismiss analysis with no place where the court can look and say, you talked about an agreement on one hand. You've talked about higher prices on the other hand. You've never connected up the two. But we're going to deny the motion to dismiss, open the door to extensive discovery and exposure to tribal damages. No case says that. Okay, thank you. Thank you. All right, we're going to put two minutes back on the clock for you. First, my colleague on the other side says that it's unreasonable for us to take the position that every contract is a contract that it meets the threshold test of Section 1. They have no case, not a single case they've cited, that says the contract has to on its face restrain trade. We have tons of cases that say every contract is a restraint. That doesn't mean that every contract is going to implicate the antitrust laws. You have to go to step two, and most contracts will not be unreasonable. So the question here, have we pled at this stage that there's some unreasonable interference with competition? And I say two things in that regard. Number one, we know that 90% of the time, 90% of the time, whether or not they were required to accept the prices, they did. They did. And if you look at ER 724, we have a confidential witness who describes how it would work. Rainmaker would come to the hotel. They would discuss who the competitors were and what data they wanted to come back in their price recommendations. That implicates anti-competitive behavior because they know that they're going to set their price based on someone else gathering the prices from their competitors, and they know their competitors are also using Rainmaker because Rainmaker advertises that. So everyone who subscribes to this knows what's going on, and I think we've led a plausible interference with competition at this stage. And prices do matter. What this Court has said in EPIC and PLS is that one of the hallmarks of interference with competition is an increase in prices. Now, they quarrel with the merits of our price increases. That quarrel is not proper at this stage. The graphs we put in more than plausibly implicate a restraint in competition in the form of higher prices. Thank you, Your Honor. Thank you, counsel. Thank you to both counsel. This case is now submitted.
judges: BEA, ALBA, Brown